# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| SYLVESTER JAMISION, ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | No. 11 C 5911 |
| ) | |
| ) | Hon. Ronald A. Guzman |
| SUPERINTENDENT BRYANT, et al., ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, a pretrial detainee at Cook County Jail, brought this *pro se* civil rights action pursuant to 42 U.S.C. § 1983. Plaintiff claims that Defendants, Superintendent Michael Bryant, Commander William Franko, Cook County Sheriff Thomas Dart, Lynette Taylor, and Dr. Carlos Quezada-Gomez, violated his Fourteenth Amendment rights by placing him in segregation without a proper mental health screening, not providing him proper mental health care while in segregation, and not holding a hearing on the disciplinary ticket that caused him to be placed in segregation. This matter is before the court for ruling on Defendants' motion for summary judgment. For the reasons stated below, the motion is granted.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In determining the existence of a genuine issue of material fact, a court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Weber v. Universities Research Assoc., Inc.*, 621 F.3d 589, 592 (7th Cir.

2010). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. The court does not "judge the credibility of the witnesses, evaluate the weight of the evidence, or determine the truth of the matter. The only question is whether there is a genuine issue of fact." *Gonzalez v. City of Elgin*, 578 F.3d 526, 529 (7th Cir. 2009) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 249-50 (1986)).

However, Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Sarver v. Experian Information Solutions*, 390 F.3d 969, 970 (7th Cir. 2004) (citations omitted).

## LOCAL RULE 56.1

Defendants filed a statement of uncontested material facts pursuant to Local Rule 56.1 (N.D. Ill.). Together with their motion for summary judgment, Defendants included a "Notice to Pro Se Litigant Opposing Motion for Summary Judgment." That notice clearly explained the requirements of the Local Rules and warned Plaintiff that a party's failure to controvert the facts as set forth in the moving party's statement results in those facts being deemed admitted. *See, e.g., Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003).

Local Rule 56.1(b) requires a party opposing a motion for summary judgment to file:

> (3) a concise response to the movant's statement that shall contain
>
> (A) a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon, and

2

> (B) a statement, consisting of short numbered paragraphs, of any additional facts that require denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon.

L.R. 56.1(b).

The district court may rigorously enforce compliance with Local Rule 56.1. *See, e.g., Stevo v. Frasor*, 662 F.3d 880, 886-87 (7th Cir. 2011) ("Because of the high volume of summary judgment motions and the benefits of clear presentation of relevant evidence and law, we have repeatedly held that district judges are entitled to insist on strict compliance with local rules designed to promote the clarity of summary judgment filings") (citing *Ammons v. Aramark Uniform Serv., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004)). Although *pro se* plaintiffs are entitled to lenient standards, compliance with procedural rules is required. *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006).

Plaintiff failed to file a proper response to Defendants' statement of uncontested facts by not indicating which statements he agrees with and which he disputes. Some of the numbered paragraphs are copied verbatim with no comment and other numbered paragraphs contain different information that appear to dispute Defendants' statement of uncontested facts. Moreover, Plaintiff either fails to properly cite to the materials that support his disagreement with certain statements of undisputed facts (Dkt. # 48, ¶ 20), or he cites only generally to an exhibit with no particular page or paragraph number. (*Id*. ¶ 6.) Furthermore, only paragraphs 1-9 properly correspond to Defendants' statement of uncontested facts and Plaintiff provides only 36 total responses to Defendants' 80 statements of fact. The Court has carefully reviewed Plaintiff's responses and finds that none of the Defendants' statement of uncontested facts are properly disputed; accordingly, Defendants' statement of uncontested facts are deemed admitted.

However, because Plaintiff is proceeding *pro se*, the Court will construe his filings broadly

and consider factual assertions he makes in his summary judgment materials to the extent that he could properly testify about the matters asserted based on his personal knowledge. Fed. R. Evid. 602.

## FACTS

Plaintiff has been a pretrial detainee at the Cook County Jail ("Jail") since November 16, 2009. (Defs.' 56.1(a)(3) Statement ¶ 1.) Plaintiff is currently housed in the Jail's Division 10, which is a medical division. (*Id.*). Tier 1A of Division 10 houses detainees who are in segregation as well as some in the general population and protective custody detainees. (*Id.* ¶ 2.) Plaintiff was housed in Tier 1A on three occasions: from June 28, 2011 to July 6, 2011; November 23, 2011 to December 2, 2011; and December 8, 2011 to December 18, 2011. (*Id.* ¶ 3.) Plaintiff's complaint relates to his placement in Tier 1A from June 28, 2011 to July 6, 2011. (*Id.* ¶ 4.)

As noted above, Plaintiff names Superintendent Michael Bryant, Cook County Sheriff Thomas Dart, Commander William Franko, Lynette Taylor, and Dr. Carlos Quezada-Gomez as Defendants. Superintendent Bryant was a superintendent in Division 10 from December 2010 through August 2011. (*Id.* ¶ 8.) Plaintiff has never met Sheriff Dart and has no "complaints" against Sheriff Dart. (*Id.* ¶ 7.) Plaintiff never saw Commander Franko, a commander in Division 10, while Plaintiff was housed in Tier 1A between June 28, 2011 and July 6, 2011. (*Id.* ¶ 9.) Lynette Taylor is a Senior Mental Health Specialist in Division 10 and has been a mental health specialist at the Jail since 1992. (*Id.* ¶ 11.) Dr. Quezada-Gomez is a licensed clinical psychologist and the Mental Health Unit Director of Division 10 and Cermak Health Services of the Jail. (*Id.* ¶ 10.) Plaintiff never met Dr. Quezada-Gomez in 2011 and only named him as a defendant because he is the "head psychiatrist" and "runs the show." (*Id.*)

4

Cermak Health Services provides an initial health care screening, including a psychological assessment by a qualified health care professional, on all detainees immediately upon the detainee's arrival at the Jail. (*Id.* ¶ 15.) When Plaintiff arrived at the Jail on November 16, 2009, he did not report any history of mental illness or suicide attempts and he denied feeling suicidal. (*Id.* ¶ 16.) Since his arrival, Plaintiff was continuously treated and monitored by a mental health professional and examined by a psychiatrist every month or few months. (*Id.* ¶ 18.) Since December 2009, Plaintiff has been prescribed medication to treat depression, including Prozac, Trazodone, Sinequan, Doxepin, Effexor, Wellbutrin, and Benadryl. (*Id.* ¶ 17.) Plaintiff was given his prescription dose every day by a nurse, including when he was in segregation. (*Id.*)

Plaintiff was seen by health professionals on at least 51 occasions from November 16, 2009 through 2011. (*Id.* ¶ 14.) Plaintiff was seen by a mental health professional on at least 30 of the 51 occasions. (*Id.*) Plaintiff always received mental health treatment outside of segregation, and whenever he requested mental health treatment, he would receive the requested treatment the next day. (*Id.* ¶ 13.)

Plaintiff was treated by psychiatrist Dr. Howard on November 2, 2010. (*Id.* ¶ 19.) Doctor Howard noted that Plaintiff had no history of suicide attempts and prescribed Doxepin and Prozac for depression. (*Id.*) Plaintiff was treated by psychiatrist Dr. Hallberg on December 10, 2010. (*Id.* ¶ 20.) Doctor Hallberg noted that Plaintiff had no suicidal ideation and switched Plaintiff's medication to Effexor and Doxepin. (*Id.*) Doctor Hallberg also offered to increase Plaintiff's mental health treatment by moving Plaintiff to the second floor of Division 10, where detainees receive Intermediate Level of Care, as defined below. (*Id.* ¶ 22.) Plaintiff refused to move to the second floor of Division 10 and receive more mental health treatment because he did not like taking part in

5

group therapy. (*Id.* ¶ 27.) Dr. Hallberg informed Plaintiff that he could change his mind in the future. (*Id.*)

Plaintiff was receiving Outpatient Level of Care ("OLC") on the third and fourth floors of Division 10. (*Id.* ¶ 22). OLC is comparable to services provided to patients who come to a mental health clinic for appointments, and such services are provided to persons whose psychiatric symptoms are fairly well-managed with medication and who have little or brief intermittent impairment in their ability to function. (*Id.*) Intermediate Level of Care ("ILC"), which is available on the second floor of Division 10, provides structured mental health programming, supervision, and support to manage symptoms of mental illness to improve functioning, not just medication administration and periodic follow-up. (*Id.* ¶ 24.) ILC is comparable to services provided to patients who need residential services, partial hospitalization, or intensive outpatient services, and it is provided to patients who have symptoms that are not well-managed and/or persistent and that impair the patient's ability to function normally in a correctional setting. (*Id.*) Specifically, ILC includes individual counseling every day, nursing staff at least twice per day, mental health staff 8 hours a day or more (rather than as needed as with OLC), a therapeutic environment, review and update of treatment plan at least every 90 days or as needed (rather than at least annually as with OLC), mental health programming of at least 10 hours per week, and weekly community meetings. (*Id.* ¶ 25.) Inmates in ILC are typically exempted from discipline due to their mental health condition. (*Id.* ¶ 26.)

Plaintiff was examined by Dr. Hallberg on January 14, 2011 and February 25, 2011. (*Id*. ¶¶ 28-29.) Dr. Hallberg noted that Plaintiff had no suicidal ideation and continued to prescribe Effexor and Doxepin for depression and Benadryl to assist with sleep. (*Id.*) Dr. Hallberg examined Plaintiff

on March 30, 2011, and noted that Plaintiff had no suicidal ideation. (*Id.* ¶ 30.) Dr. Hallberg spoke with Plaintiff about taking Trazodone and prescribed Trazadone, Effexor and Benadryl. (*Id.*) Dr. Hallberg also informed Plaintiff that therapy services were not possible in Division 10 but Plaintiff could do an extended stay at 2 South at Cermak, where therapy and 24-hour per day access to mental health staff and nurses were available. (*Id.* ¶ 31.) Plaintiff refused Dr. Hallberg's offer. (*Id.* ¶ 32.)

On April 19, 2011, Dr. Hallberg examined Plaintiff and noted that Plaintiff had no suicidal ideation. (*Id*. ¶ 33.) Dr. Hallberg prescribed Plaintiff Bupropion, Trazodone, and Benadryl. (*Id.*) Another psychiatrist, Dr. Kelner, treated Plaintiff on May 26, 2011, and noted that Plaintiff was not in apparent distress, denied depression and suicidal ideation, had reached a partial level of stability, and had been compliant with his medications. (*Id.* ¶ 34.) Dr. Kelner prescribed Plaintiff Bupropion, Benadryl, Prozac, Trazodone, and Effexor. (*Id.*) Plaintiff refused group art therapy on May 31, 2011. (*Id.* ¶ 35.)

On June 28, 2011, two "poppers" were found in the cell door locking mechanism of Plaintiff's cell number 4113 and cell number 4116. (*Id*. ¶ 46.) A popper was previously found inside Plaintiff's cell door locking mechanism. (*Id.* ¶ 47.) Detainees place poppers, which in Plaintiff's cell were playing cards folded in a string, in cell door locks to prevent them from locking properly. (*Id.* ¶ 48.) Poppers create great risk of escape and security. (*Id.* ¶ 51.) If an inmate is able to manipulate his cell door lock and escape his cell, he could put himself and others in serious danger. (*Id.*)

When the poppers were discovered, Plaintiff was removed from his cell and placed in Tier 1A for segregation confinement between June 28, 2011 and July 6, 2011, to await his disciplinary board hearing. (*Id*. ¶ 49.) Immediate placement of Plaintiff into segregation confinement was

7

appropriate and consistent with the Sheriff's Department's policy that allows immediate pre-hearing detention when the Plaintiff's presence in the general population possesses a serious threat to life, property, himself, staff, other detainees, and the security of the institution. (*Id.* ¶ 50.) Plaintiff was previously convicted of second degree murder, armed robbery with a firearm, aggravated unlawful use of a weapon, and is currently incarcerated pending his case for attempted first degree murder. (*Id.* ¶ 52.)

Plaintiff and all other individuals housed in cells 4113 and 4116 had to be removed from their cells where the poppers were found and away from general population because these individuals presented a serious escape and security risk, and inmates are better monitored in segregation than in the general population. (*Id*. ¶ 53.) Placement of these individuals in segregation for close monitoring was necessary for the effective management and security of the jail. (*Id.* ¶ 54.)

Detainees in disciplinary detention receive daily visits from the Shift Commander or designee and qualified health personnel three times per week unless additional medical attention is required. (*Id*. ¶ 55.) The correctional officers assigned to the segregation unit personally observe all detainees every thirty minutes. (*Id.*) Inmates are screened prior to or within 24 hours after placement in segregation or protective custody to determine if the inmate is psychiatrically stable. (*Id.* ¶ 56.) If the inmate is not stable enough to be housed in segregation or protective custody, he is transferred to Tier 2 North in Cermak, an acute mental health inpatient unit. (*Id.*) The screening for segregation and protective custody involves assessment of information collected from the patient and review of the clinical record to determine a risk level of self harm. (*Id.* ¶ 58.) The information considered includes past history of self-injury; recent substance abuse; whether the patient is experiencing withdrawal; whether his current psychiatric state is stable and symptoms are managed; whether the

patient has thoughts of hurting himself, and, if so, whether such thoughts are increasing and whether the patient feels he is able to control such thoughts; whether the patient has an actual plan to hurt himself, and, if so, whether such plan is realistic and concrete; whether the patient could carry out a plan to hurt himself; whether the patient has positive factors that can counter thoughts or plans to hurt himself, such as strong religious convictions that prohibit suicide, level of support from family, staff and other inmates, ability to manage stress, and coping mechanisms. (*Id.* ¶ 59.)

When Plaintiff was removed from his cell, he met with Ms. Taylor for a mental health assessment. (*Id.* ¶ 36.) Ms. Taylor has been trained to conduct a screen for suicidal ideation and has approximately 20 years of experience working with forensic and correctional mental health populations. (*Id.* ¶ 57.) During Ms. Taylor's assessment of Plaintiff, she observed and documented that Plaintiff denied suicidal ideation and was in compliance with his medication. (*Id.* ¶ 60.) She further noted that Plaintiff had a good appetite, no weight change, no change in sleep, good general hygiene, normal appearance and speech, good eye contact, normal motor activity, cooperative demeanor, good mental health orientation as to person, place, time and situation, normal mood, adequate insight and judgment, organized thoughts, no hallucinations, was alert and denied homicidal ideation. (*Id.* ¶ 60.) Further, Plaintiff's medical records showed that Plaintiff did not have a history of suicide attempts. (*Id.* ¶ 61.)

Upon completing the screening, Ms. Taylor found that Plaintiff had no clinical contraindications to being housed in segregation and determined that there was no substantial risk of serious harm. (*Id.* ¶ 62.) Ms. Taylor informed Plaintiff how to seek psychiatric services in segregation by submitting a health service request from or alerting any staff or officer. (*Id.* ¶ 63.) Plaintiff only met with Ms. Taylor this one time, and when asked what he told her exactly, he

9

testified: "I told her they been spinning me, the officers been lying to me about seeing a psychiatrist, I need to see a psychiatrist . . . ." (*Id.* ¶ 64.)

Plaintiff alleges that between June 28, 2011 and July 6, 2011, he felt overwhelmed and suicidal, was not eating, had difficulty sleeping and nightmares, and took some unknown pills he obtained from other inmates. (*Id*. ¶ 65.) Plaintiff's medical records do not include any of these issues. (*Id.*) Plaintiff further alleges that he told unnamed officers working on Tier 1A that he felt suicidal and that he wanted an evaluation by a psychiatrist or psychologist. (*Id.* ¶ 66.) Plaintiff did not inform any officers that he was taking pills that he obtained from other inmates. (*Id.*)

Plaintiff further alleges that he told Superintendent Bryant that he needed a psychiatric evaluation, but Superintendent Bryant did not respond. (*Id*. ¶ 67.) When Superintendent Bryant did not respond, Plaintiff cursed him out. (*Id.*) These statements were the only statements Plaintiff made to Superintendent Bryant. (*Id.*)

On July 1, 2011, there was smoke on the deck, so Nurse Price checked on Plaintiff who denied any medical complaints. (*Id.* ¶ 37.)

When jail officials realized that 72 hours had passed without Plaintiff having had a hearing for the poppers in his cell lock, all charges were dropped and Plaintiff was returned to the general population. (*Id.* ¶ 75.)

On July 11, 2011, Plaintiff again denied any medical complaints other than he was eating a lot of salt. (*Id.* ¶ 38.) On July 13, 2011, Plaintiff received a psychiatric evaluation by Mental Health Specialist Donna Albert. (*Id.* ¶ 39.) Plaintiff denied suicidal and homicidal ideation. (*Id.*)

On August 15, 2011, Plaintiff refused consent to a physical examination, stating in a form, "I'm healthy as they come. I probably have the best health in the building. If not, I'll do until he

10

gets here." (*Id.* ¶ 40.) On August 18, 2011, Plaintiff was examined by Dr. Kelner, who noted that Plaintiff reported no active psychiatric complaints, he had no suicidal ideation, and that he was doing better on the current regimen of prescriptions. (*Id.*, ¶ 41.) Dr. Kelner prescribed Plaintiff Bupropion, Benadryl, Trazodone, and Effexor. (*Id.*)

The Cook County Department of Corrections ("CCDOC") "Detainee Grievance Procedure" General Order 14.5 governed the administration grievance process from November 16, 2009 until July 13, 2011, and was available to all inmates from November 16, 2009 until July 13, 2011. (*Id.* ¶ 76.) The CCDOC "Inmate Grievance Procedure" Sheriff's Order 11.14.5.0 has governed the administration grievance process since July 14, 2011 to the present and was available to all inmates from July 14, 2011 to the present. (*Id.*) Under both the Detainee Grievance Procedure and Inmate Grievance Procedure, an inmate must deliver the grievance to the Correctional Rehabilitation Worker (CRW) within 15 days of the event he is grieving. (*Id.* ¶ 77.)

Plaintiff was aware of the grievance process. (*Id.* ¶ 78.) Plaintiff claims that after he left segregation, he submitted a grievance to CRW Freeman while housed in Tier 4A of Division 10, and this is the only grievance that he filed related to this case. (*Id.* ¶ 79.) Between June 28, 2011 and July 22, 2011, CRW Freeman never obtained a grievance from Plaintiff. (*Id.* ¶ 80.)

## **ANALYSIS**

Exhaustion of administrative remedies, pursuant to the Prison Litigation Reform Act, is required for all prisoner/detainee suits seeking redress for prison circumstances or occurrences, regardless of whether they involve general circumstances of incarceration or particular episodes. *See Porter v. Nussle*, 534 U.S. 516 (2002). Under 42 U.S.C. § 1997e(a), the court is directed to dismiss a suit brought with respect to prison conditions if the court determines that plaintiff has

11

failed to exhaust his administrative remedies. *Perez v. Wisconsin Dept. of Corrections*, 182 F.3d 532 (7th Cir. 1999).

A prisoner/detainee must take all the steps required by the institution's grievance system in order to exhaust his administrative remedies properly. *Ford v. Johnson*, 362 F.3d 395, 397 (7th Cir. 2004); *Pozo v. McCaughtry*, 286 F.3d 1022, 1023-24 (7th Cir. 2002). Moreover, exhaustion is a precondition to filing suit, so that a detainee's attempt to exhaust available administrative remedies in the midst of litigation is insufficient. *See Ford*, 362 F.3d at 398; *Perez*, 182 F.3d at 536-37.

To exhaust remedies under § 1997e(a), a prisoner "must file complaints and appeals in the place, and at the time, the prison's administrative rules require." *Pozo*, 286 F.3d at 1025; *see also Freeman v. Francis*, 196 F.3d 641, 644 (6th Cir. 1999) ("[T]he exhaustion requirement in § 1997e(a) is directed at exhausting the prisoner's administrative remedies in the corrections system, and investigation by another agency does not satisfy the requirement of the statute."). The purpose behind the exhaustion requirement is to give corrections officials the opportunity to address complaints internally before a federal suit is initiated. *See Porter*, 534 U.S. at 524-25.

In his response to Defendants' motion, Plaintiff concedes that he did not file a grievance related to his alleged lack of proper psychiatric treatment. However, he argues, that a "grievance" filed by David Olsson, the "Attorney-in-Fact for Larry M. Banks" should suffice for the exhaustion requirement. First, the grievance relied upon by Plaintiff was not Plaintiff's grievance, it was filed on behalf of Larry M. Banks. Second, the grievance pertains to a different incident that occurred in late November 2011, regarding Banks being placed in segregation for wearing a religious skull cap. Thus, Plaintiff failed to exhaust his administrative remedies.

Based on the above, no genuine issue of material facts exists as to whether Plaintiff failed

to fully exhaust his administrative remedies. Consequently, this case must be dismissed in light of Plaintiff's failure to finalize the administrative exhaustion process.

Even if Plaintiff had exhausted his administrative remedies, his claims that the Defendants violated his Fourteenth Amendment rights by placing him in segregation without a proper mental health screening and by not providing him proper mental health care while in segregation fail. Correctional officials and health care providers may not act with deliberate indifference to an inmate's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Fields v. Smith*, 653 F.3d 550, 554 (7th Cir. 2011). Deliberate indifference has both an objective and a subjective element: the inmate must have an objectively serious medical condition, and the defendant must be subjectively aware of and consciously disregard the inmate's medical need. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Estelle*, 429 U.S. at 103-04; *see also Roe v. Elyea*, 631 F.3d 843, 862 (7th Cir. 2011). Plaintiff's risk of suicide based on the lack of proper treatment is an objectively serious medical condition. *See Minix v. Canarecci*, 597 F.3d 824, 830 (7th Cir. 2010). However, Plaintiff has failed to demonstrate a genuine issue of material fact exists as to whether the Defendants were deliberately indifferent to Plaintiff's alleged risk of suicide based on the alleged lack of proper psychiatric care while in segregation.

To establish a deliberate indifference claim, a prisoner must demonstrate that the defendant in question was aware of and consciously disregarded the inmate's medical need. *Farmer*, 511 U.S. at 837; *Estelle*, 429 U.S. at 103-04; *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008). The fact that a prisoner has received some medical treatment does not necessarily defeat his claim; deliberate indifference to a serious medical need can be manifested by "blatantly inappropriate" treatment, *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005) (emphasis in original), or by "woefully

inadequate action," as well as by no action at all. *Reed v. McBride*, 178 F.3d 849, 854 (7th Cir. 1999); *Allen v. Wexford Health Sources, Inc.*, No. 11 C 3834, 2011 WL 2463544, *1 (N.D. Ill. Jun. 17, 2011). Neither medical malpractice nor a mere disagreement with a doctor's medical judgment amounts to deliberate indifference. *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010) (citing *Estelle*, 429 U.S. at 106).

Here, Plaintiff concedes that he had not even met Sheriff Dart nor Dr. Quezada-Gomez in 2011, and that they lacked any knowledge that Plaintiff was in need of psychiatric care while in segregation. Furthermore, Plaintiff testified in his deposition that he had not seen Commander Franko during the relevant time period. While he now disputes that testimony, Plaintiff cannot defeat summary judgment with a new affidavit that contradicts his deposition testimony. *See LaFary v. Rogers Grp., Inc.*, 591 F.3d 903, 908 (7th Cir. 2010). Importantly, Plaintiff never told any of the Defendants that he felt suicidal or that he was taking pills that he had received from other inmates.

While Plaintiff did tell Ms. Taylor that "they been spinning me, the officers been lying to me about seeing a psychiatrist, I need to see a psychiatrist," when he met with her the day he was placed in segregation, her overall assessment of Plaintiff was that he did not have any clinical contraindications to being housed in segregation and she determined that there was no substantial risk of serious harm. Ms. Taylor has been trained to conduct a screen for suicidal ideation and had approximately 20 years of experience working with forensic and correctional mental health populations. During Ms. Taylor's assessment of Plaintiff, she observed and documented that Plaintiff denied suicidal ideation, was in compliance with his medication, and appeared to have good mental health and normal mood, among other things. Further, Plaintiff's medical records showed that Plaintiff denied suicidal ideation and did not have a history of suicide attempts. Ms. Taylor also

14

informed Plaintiff how to seek psychiatric services in segregation, specifically, submitting a health service request from or alerting any staff or officer. This was Ms. Taylor's only meeting with Plaintiff.

These undisputed facts demonstrate that Plaintiff received a mental screening before being placed in segregation and that the screening did not demonstrate that Plaintiff would be at a serious risk of harm if placed in segregation. The undisputed facts also demonstrate that Ms. Taylor was not aware of, nor that she consciously disregarded, Plaintiff's alleged suicidal ideation while in segregation. While Plaintiff may have wanted to be screened by a psychiatrist or psychologist, Ms. Taylor was trained to conduct the screening and his personal difference in opinion on who should have conducted the screening does not amount to deliberate indifference. Inmates are not constitutionally entitled either to "demand specific care" or even to receive the "best care possible;" rather, they are entitled to "reasonable measures to meet a substantial risk of serious harm." *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011) (citing *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997)).

Similarly, Plaintiff's single comment to Superintendent Bryant that he needed a psychiatric evaluation was insufficient to establish that he was subjectively aware of Plaintiff's serious risk of harm and that he disregarded that risk. When Superintendent Bryant did not respond, Plaintiff cursed him out. Plaintiff's single general statement about needing a psychiatric evaluation was insufficient to demonstrate that Superintendent Bryant had subjective knowledge that Plaintiff was in serious risk of harm while in segregation. *See Johnson v. Doughty*, 433 F.3d 1001, 1012 (7th Cir. 2006) (non-medical jail official not deliberately indifferent simply because he failed to respond directly to complaint of prisoner who was already being treated by the prison doctor); *Greeno v.*

15

*Daley*, 414 F.3d 645, 656 (7th Cir. 2005) (non-medical official is justified in believing the prisoner is in capable hands if the prisoner is under the care of medical staff).

Plaintiff also alleges that he was placed in segregation as punishment because he is a psychiatric patient and that his due process rights were violated because he did not receive a hearing prior to being placed in segregation. The Court notes that in his response to the Defendants' motion for summary judgment, Plaintiff's argument related to being placed in segregation is based on a different incident in November 2011, when he was again placed in segregation. Plaintiff cannot raise this unrelated new claim at this time and the Court will not consider it. *See Berry v. Chi. Transit Auth.*, 618 F.3d 688, 693 (7th Cir. 2010).

Plaintiff's argument that he was sent to segregation because he is a psych patient is meritless. The undisputed facts show that Plaintiff was sent to segregation because poppers were found in the door-locking mechanism of his cell and that the presence of the poppers created a security risk. Removing Plaintiff and the other detainees from the cells that had poppers was consistent with the policy allowing immediate removal of detainees for violations that could present a security risk.

Plaintiff's due process claim is also meritless. A pretrial detainee cannot be punished for misconduct while in custody without due process. *Bell v. Wolfish*, 441 U.S. 520, 535-37 (1979); *Higgs v. Carter*, 286 F.3d 437, 438-39 (7th Cir. 2002). To establish a due process claim, the pretrial detainee must demonstrate either an "expressed intent to punish on the part of detention facility officials" or that the challenged condition or restriction lacked a reasonable relationship to a legitimate non-punitive administrative purpose. *Bell*, 441 U.S. at 538-39; *Rapier v. Harris*, 172 F.3d 999, 1005 (7th Cir. 1999).

Here, Plaintiff has not demonstrated that he was placed in segregation with the expressed

16

intent to be punished. Instead, the undisputed facts demonstrate that Plaintiff, as well as the other pretrial detainees in the cells with poppers in their doors, were considered an escape and security risk so they were placed in segregation, consistent with Jail policy. Placing Plaintiff in segregation had a reasonable relationship to a legitimate non-punitive administrative purpose. *See Zarnes v. Rhodes*, 64 F.3d 285, 291 (7th Cir. 1995) (defendant's decision to segregate detainee lacked punitive intent because the context of the statement showed that the conduct posed a security threat). To the extent that Plaintiff contends that his segregation violated the Jail's regulations, violations of statutes, regulations, and internal rules do not give rise to a § 1983 claim. *See, e.g., Pozo v. Hein*, 179 Fed. Appx. 962, 964, 2006 WL 1217881, at *1 (7th Cir. May 8, 2006); *Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003).

Finally, Plaintiff makes reference to an equal protection violation. However, because the claim is completely undeveloped and Plaintiff makes no reference to any evidence in support of a violation of the Equal Protection clause, this Court will not consider it.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment [35] is granted. Judgment is rendered in favor of Defendants. This case is terminated.

**Dated**: December 21, 2012

_____
**Ronald A. Guzman**
**United States District Judge**